## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

DANIEL GRAZIANO, Derivatively on Behalf of Nominal Defendant ZYNEX, INC.,

Plaintiffs,

v.

THOMAS SANDGAARD, DANIEL MOORHEAD, JOSHUA R. DISBROW, MICHAEL D.
CRESS, and BARRY D. MICHAELS,

Defendants,

-and-

ZYNEX, INC., a Nevada Corporation,

Nominal Defendant.

---

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT AND JURY DEMAND

Plaintiff Daniel Graziano ("Plaintiff"), by and through the undersigned attorneys, brings
this derivative complaint for the benefit of Nominal Defendant Zynex, Inc. ("Zynex" or the
"Company"), against current and former executive officers and members of the Company's Board
of Directors (the "Board") for breaches of fiduciary duties, unjust enrichment, waste of corporate
assets, and violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the
"Exchange Act").

Plaintiff's allegations are based upon personal knowledge, and upon information and
belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of
publicly available information, including filings by Zynex with the United States Securities and
Exchange Commission (the "SEC"); press releases, new reports, analyst reports, investor

1

conference transcripts, publicly available filings in lawsuits, including the securities class action lawsuit *Tuncel v. Zynex, Inc. et al.*, Case No. 1:25-cv-00913 (D. Col.) (the "Securities Class Action"); corporate governance documents available on Zynex's website; and other publicly available information.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Zynex's officers and directors from at least March 13, 2023, to the present (the "Relevant Period").

2.      Prior to the Relevant Period, Zynex positioned itself as a leader in the medical device industry, touting consistent revenue growth and operational success. In 2022, the Company reported a 21% year-over-year revenue increase to $158.2 million, a 48% increase in orders, and seven consecutive years of profitability. These results, announced in a March 13, 2023 press release, set the stage for optimistic projections about Zynex's growth trajectory.

3.      Unbeknownst to analysts and investors, however, at the same time, the Individual Defendants began artificially inflating Zynex's stock price by issuing or allowing false and misleading statements about the Company's financial performance, operational practices, and compliance with insurance reimbursement policies. These statements concealed a systemic "oversupplying scheme" whereby Zynex shipped excessive quantities of supplies, such as electrode pads and batteries, to patients, billing insurers for thousands of dollars more than necessary. Zynex's undisclosed practices drew scrutiny from insurers, including Tricare (the federal health insurer for the military), which represented 20–25% of its annual revenue.

4.      The truth began to emerge on June 4, 2024, when the medical journal *STAT* published an investigative report titled "How a device maker inundated pain patients with

unwanted batteries and surprise bills." The report revealed Zynex's oversupplying scheme, stating:

> [Zynex], with headquarters in Englewood, Colo., has manufactured small machines that deliver different series of electrical pulses to the injured areas via wires and electrode pads.
>
> \*      \*      \*
>
> . . . the regular shipments also allow Zynex to bill insurers for thousands of dollars more than it otherwise could.
>
> \*      \*      \*
>
> The problem is that insurers are growing wise to the program and kicking the company out of network.

5.       The *STAT* report detailed patient complaints, such as Michelle Bean, who received unneeded supplies and faced $1,000 in bills after Zynex falsely assured coverage by Tufts Health Plan. Former employees confirmed the scheme's systemic nature, costing Zynex business as insurers terminated network agreements.

6.       On June 4, 2024, Zynex's stock price fell $0.50 per share, or 5%, closing at $9.35 on unusually heavy trading volume, reflecting investor alarm over the exposed misconduct. This decline eroded shareholder value and signaled market distrust in Zynex's reported financials.

7.       Despite this disclosure, Defendants continued to make or allow misleading statements. For example, on July 25, 2024, Zynex's second-quarter 2024 press release claimed an 11% revenue increase to $49.9 million and a 20% order increase, with Sandgaard asserting, "[t]he second quarter of 2024 was highlighted by a strong cadence of order growth and revenue[.]" The release attributed lower-than-expected revenue to sales force reductions, omitting insurer scrutiny as a factor.

8.       The full extent of Zynex's misconduct was finally revealed on March 11, 2025, when the Company issued a press release announcing fourth-quarter and full-year 2024 results.

The release disclosed a significant revenue "shortfall" due to "slower than normal payments from certain payers" and revealed, "Tricare has temporarily suspended payments as they review prior claims." The March 11, 2025, press release admitted that Tricare, representing 20% to 25% of Zynex's annual revenue, was scrutinizing prior claims, threatening the Company's financial stability.

9.      The next day, on March 12, 2025, Zynex's stock price plummeted $3.59 per share, or 51.3%, closing at $3.41 per share. This catastrophic decline wiped out significant shareholder value, reflecting the market's reaction to Zynex's exposure to regulatory and financial risks concealed by the Individual Defendants.

10.     The Individual Defendants' misconduct has caused substantial harm to Zynex, including costs associated with the Securities Class Action, overpayment for repurchases of Company securities at inflated prices, reputational and economic damage from insurer terminations, and a "liar's discount" affecting the Company's stock price and ability to raise capital on favorable terms.  This action seeks to remedy these wrongs and hold the Individual Defendants accountable to Zynex.

## **JURISDICTION AND VENUE**

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)) and Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

12.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

13.     This action is not a collusive one to confer jurisdiction on a court of the United States which it would otherwise not have.

14.     Venue is proper in this court under 28 U.S.C. § 1391, because (i) Zynex is headquartered in this District, (ii) a substantial portion of the transactions and wrongs complained of herein occurred in this jurisdiction, and (iii) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that have had an effect in this District.

## PARTIES

15.     Plaintiff is a current shareholder of Zynex and has continuously held Zynex stock at all relevant times.

16.     Nominal Defendant Zynex is a Nevada corporation with its principal executive offices located at 9655 Maroon Circle, Englewood, Colorado 80112. Zynex's common stock trades on the Nasdaq under the ticker symbol "ZYXI."

17.     Defendant Sandgaard has served as the Zynex's President, Chief Executive Officer ("CEO"), and Chairman of the Board since founding the Company in 1996. According to the proxy statement filed on Schedule 14A with the SEC on March 28, 2025 (the "2025 Proxy Statement"), in 2024, Defendant Sandgaard received $991,810 in total compensation from the Company.

18.     Defendant Moorhead has served as Zynex's Chief Financial Officer ("CFO") since June 2017. According to the 2025 Proxy Statement, in 2024, Defendant Moorhead received $909,805 in total compensation from the Company.

19.     Defendant Disbrow has served as a Company director since 2018. Defendant Disbrow also serves as the Chair of the Board's Nominating and Corporate Governance Committee and as a member of its Audit and Compensation Committees. According to the 2025 Proxy

Statement, in 2024, Defendant Disbrow received $170,000 in total compensation from the Company.

20.     Defendant Cress has served as a Company director since 2018. Defendant Disbrow also serves as the Chair of the Board's Compensation Committee and as a member of its Audit and Nominating and Corporate Governance Committees. According to the 2025 Proxy Statement, in 2024, Defendant Cress received $170,000 in total compensation from the Company.

21.     Defendant Michaels has served as a Company director since 2018. Defendant Michaels also serves as the Chair of the Board's Audit Committee and as a member of its Compensation and Nominating and Corporate Governance Committees. According to the 2025 Proxy Statement, in 2024, Defendant Michaels received $175,000 in total compensation from the Company.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

22.     By reason of their positions as officers, directors, and/or fiduciaries of Zynex and because of their ability to control the business and corporate affairs of Zynex, the Individual Defendants owed Zynex and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Zynex in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Zynex and its shareholders.

23.     Each director and officer of Zynex owes to Zynex and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of Zynex and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

24.     The Individual Defendants, as officers and/or directors of a publicly held company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the

NASDAQ, had a duty to promptly disseminate accurate and truthful information regarding Zynex's operations, finances, financial condition, financial statements, performance, growth, earnings, internal controls, and present and future business prospects so that the market price of Zynex's stock would be based on truthful, accurate, and fairly presented information.

25.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Zynex, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Zynex. Because of their advisory, executive, managerial and directorial positions with Zynex, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of Zynex.

26.    The Individual Defendants, as officers and/or directors of Zynex, were required to discharge their duties by exercising reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of Zynex. By virtue of such duties, the officers and directors of Zynex were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)    conduct the affairs of the Company in an efficient, ethical, and businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide the public, investors, and analysts as to the true financial condition of the Company at any given time, including making accurate statements

about the Company's business prospects, and ensuring that the Company maintained an adequate

system of internal legal, financial, and management controls such that the Company's financial

reporting would be true and accurate at all times;

(d)     remain informed as to how the Company conducted its operations, and,

upon receipt of notice or information of imprudent or unsound conditions or practices, make

reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and

make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent

manner in compliance with all applicable federal, state and local laws, and rules and regulations;

and

(f)     ensure that all decisions were the product of independent business judgment

and not the result of outside influences or entrenchment motives.

27.     Each Individual Defendant, by virtue of his or her position as a director and/or

officer, owed to Zynex and to its shareholders the fiduciary duties of loyalty, good faith, and the

exercise of due care and diligence in the management and administration of the affairs of the

Company, as well as in the use and preservation of its property and assets.

28.     The conduct of the Individual Defendants complained of herein involves a knowing

and culpable violation of their obligations as directors and officers of Zynex, the absence of good

faith on their part, and a reckless disregard for their duties to Zynex and its shareholders that the

Individual Defendants were aware or should have been aware posed a risk of serious injury to the

Company.

29.     The Individual Defendants breached their duties of loyalty and good faith by

causing Zynex to issue false and misleading statements concerning its financial condition. As a

result, Zynex has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## THE CODE OF CONDUCT

30.     The Individual Defendants breached their fiduciary duties to Zynex by violating the Company's Code. These violations, tied to the fraudulent oversupplying scheme and false statements alleged in the Securities Class Action, involved misrepresentations, corporate fraud, unethical conduct, insider trading, and false financial reporting, causing significant financial and reputational harm to Zynex.

31.     The Code mandates that all employees, directors, and officers, including the Individual Defendants, "conduct themselves accordingly and seek to avoid even the appearance of improper behavior." It emphasizes: "Obeying the law, both in letter and in spirit, is the foundation on which this Company's ethical standards are built." Defendants' orchestration of an oversupplying scheme, shipping excessive electrode pads and batteries to patients and billing insurers like Tricare for unwarranted amounts, violated this fundamental obligation by engaging in practices that drew regulatory scrutiny and potential penalties.

32.     The Code specifically addresses compliance with healthcare laws, stating:

> In particular, the Company's delivery of health care products is highly regulated by federal and state law with respect to fraud and abuse. These include laws and regulations, among others, (i) requiring strict privacy of patient information; (ii) regulating insurance billing, including Medicare and Medicaid; (iii) requiring state licenses for the sale of the Company's products; and (iii) (sic) prohibiting the offer of any payment by the Company or its representatives in return for the purchase or use of the Company's products.

33.     Defendants violated this provision by permitting Zynex to submit fraudulent claims to insurers, inflating revenue through excessive supply shipments. Defendants failed to disclose to investors, among other things: (1) that Zynex shipped products, including electrodes, in excess of

need; (2) that, as a result of this practice, the Company inflated its revenue. This misconduct contravened federal and state regulations governing insurance billing, exposing Zynex to insurer network terminations and potential fines.

34.    Sandgaard and Moorhead, as CEO and CFO, directly oversaw false statements that concealed this scheme, such as the April 27, 2023, press release claiming a 36% revenue increase to $42.2 million due to "highest number of orders in Company history." These statements violated the Code's requirement for honest financial reporting, as they misrepresented the true driver of revenue—fraudulent billing practices.

35.    The Code mandates accurate record-keeping, stating under the subheading "Protect Privacy, Ensure Security," in relevant part:

> All of the Company's books, records, accounts, billings and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must conform both to applicable legal requirements and to the Company's system of internal controls. Unrecorded or "off the books" funds or assets should not be maintained.

36.    The Defendants breached this duty by allowing Zynex's financial statements, such as the 2023 Form 10-K, to report inflated revenue without disclosing the oversupplying scheme. The 10-K's claim, "[w]e maintain an allowance for provider discounts and amounts intended to cover legitimate requests for repayment[,]" was misleading, as it implied robust controls while concealing invalid claims under insurer scrutiny. This violation led to a $6.2 million write-off of slow-collecting receivables, harming Zynex's financial integrity.

37.    Disbrow, Cress, and Michaels, as Audit Committee members, failed to ensure compliance with the Code's record-keeping standards. Their negligence allowed false financial reports to be disseminated, breaching their fiduciary duty to oversee accurate disclosures.

38.    The Code prohibits insider trading, stating: "Covered Persons who have access to

10

confidential or non-public information about the Company are not permitted to use or share that information for stock trading purposes or for any other purpose except the conduct of the Company's business." Sandgaard sold 624,000 shares for more than $5.67 million, and Moorhead sold 85,000 shares for $687,200 during the Securities Class Action class period, exploiting nonpublic knowledge of the oversupplying scheme, which risked insurer scrutiny and revenue losses. These sales violated the Code and harmed Zynex by, among other things, undermining investor trust.

39.    The insider trading by Sandgaard and Moorhead directly contravened the Code's conflict of interest policy, which defines a conflict as "when a person's private interest interferes in any way with the interests of the Company." By profiting from inflated stock prices before the June 4, 2024, *STAT* report and the March 11, 2025, Tricare disclosure, these defendants prioritized personal gain over Zynex's interests, exacerbating the stock's 51.3% collapse on March 12, 2025.

40.    The Code requires ethical conduct, stating: "Those who violate the standards in this Code will be subject to disciplinary action, up to and including termination of employment." The Defendants' failure to address the oversupplying scheme, despite prior lawsuits (*e.g.*, a 2014 claim alleging fraudulent Medicare billing) and other red flags, demonstrated unethical behavior, violating this mandate and exposing Zynex to reputational damage from patient complaints reported by *STAT*.

41.    The *STAT* report on June 4, 2024, revealed patient exploitation, quoting Michelle Bean: "I just feel like the whole thing was a way to make money and prey on people." This public exposure violated the Code's commitment to fair dealing, which requires: "Each Covered Person should endeavor to respect the rights of and deal fairly with the Company's customers, suppliers, competitors and employees." Defendants' inaction harmed Zynex's reputation, leading to insurer

network terminations.

42.     The Code imposes specific obligations on Senior Financial Management, including Sandgaard and Moorhead, stating:

> All members of the Senior Financial Management shall: . . . Provide full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the SEC and in other public communications by the Company        Promptly bring to the attention of the [CEO], Chief Operating Officer or the [CFO] any information concerning (a) significant deficiencies in the design or operation of internal controls[.]

43.     Sandgaard and Moorhead violated this duty by failing to disclose the oversupplying scheme's impact on Zynex's revenue and internal controls. Their false and misleading statements, such as the October 26, 2023, claim of "increasing revenue and cash flow momentum," concealed insurer scrutiny, leading to a $0.50 stock price drop on June 4, 2024, and a $3.59 drop on March 12, 2025.

44.     Defendants' violations caused Zynex to incur substantial financial losses, including litigation costs from the Securities Class Action, potential repayments to insurers, and tens of millions of dollars in stock repurchases at inflated prices during 2023 and 2024. The March 11, 2025, disclosure of Tricare's payment suspension, affecting 20–25% of revenue, confirmed the scheme's devastating impact, triggering a 51.3% stock price collapse.

45.     The reputational harm was equally severe, as the *STAT* report's exposure of patient exploitation and insurer terminations undermined Zynex's credibility. The Code's commitment to ethical conduct was breached, as the Individual Defendants' actions led to a "liar's discount" that will depress Zynex's stock price, increase its cost of capital, and hinder its ability to attract investors and maintain business relationships.

46.     Defendants' failure to report unethical practices violated the Code's complaint procedures, which encourage: "Any person who has complaints or concerns about the Company's

accounting, internal accounting controls or auditing matters . . . is strongly encouraged to report such matters to the Audit Committee." By concealing the scheme, the Individual Defendants prevented timely corrective action, prolonging Zynex's exposure to harm.

47.     These Code violations breached the Individual Defendants' fiduciary duties of loyalty, good faith, and due care, as they prioritized personal gain and concealed misconduct that harmed Zynex. Defendants' actions directly caused the financial and reputational damages alleged, necessitating this derivative action to hold them accountable.

## THE AUDIT COMMITTEE CHARTER

48.     Defendants Michaels, Disbrow, and Cress, as members of Zynex's Audit Committee, breached their fiduciary duties by failing to fulfill the responsibilities outlined in the Company's Audit Committee Charter. These breaches, tied to the fraudulent oversupplying scheme and false financial statements alleged in the Securities Class Action, allowed Zynex to misrepresent its financial performance and compliance, causing significant harm, including a 51.3% stock price collapse on March 12, 2025.

49.     Zynex's Audit Committee Charter mandates that members "oversee the Company's accounting and financial reporting processes and the audit of the Company's financial statements." It specifies that members must be independent, financially literate, and include at least one "audit committee financial expert" per SEC regulations. Michaels, as Chair, and Disbrow and Cress, as members, were responsible for ensuring accurate financial disclosures and robust internal controls.

50.     The Audit Committee Charter requires the Audit Committee to:

[R]eview with management, and the Company's independent auditors the adequacy and effectiveness of the Company's financial reporting processes, internal control over financial reporting and disclosure controls and procedures, including any significant deficiencies or material weaknesses in the design or operation of, and any material changes in, the Company's processes, controls and procedures and any special audit steps adopted in light of any material control deficiencies, and any

fraud involving management or other employees with a significant role in such processes, controls and procedures.

51.    Michaels, Disbrow, and Cress breached this duty by failing to detect or address the oversupplying scheme, whereby Zynex shipped excessive electrode pads and batteries to patients, inflating claims to insurers like Tricare. Moreover, they failed to disclose to investors that Zynex shipped products, including electrodes, in excess of need and that, as a result of this practice, the Company inflated its revenue. This scheme constituted fraud by management, which the Audit Committee consciously failed to investigate or address. The Audit Committee's negligence allowed false statements, such as the April 27, 2023, press release claiming a 36% revenue increase to $42.2 million, to be disseminated without scrutiny.

52.    The Audit Committee Charter mandates the Audit Committee to "review and discuss with the Company's independent auditors and management the Company's annual audited financial statements . . . and the disclosure under 'Management's Discussion and Analysis of Financial Condition and Results of Operations'" before filing the Form 10-K. The 2023 Form 10-K, falsely claimed, "[w]e maintain an allowance for provider discounts and amounts intended to cover legitimate requests for repayment[,]" implying effective controls while concealing invalid claims under scrutiny. The Audit Committee's failure to challenge this misleading disclosure breached their duty to ensure accurate financial reporting.

53.    The charter requires the Audit Committee to:

[R]eview with management and the Company's independent auditors: any major issues regarding accounting principles and financial statement presentation, including any significant changes in the Company's selection or application of accounting principles; any significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements[.]

54.    The Audit Committee breached this duty by failing to timely take all or a portion of the Company's $6.2 million write-off of slow-collecting receivables. This omission misled

investors about Zynex's financial health, contributing to the stock's artificial inflation until the March 11, 2025 disclosures.

55.    The Audit Committee Charter also mandates oversight of "the Company's relationships and transactions with related parties that are significant to the company." The Audit Committee failed to scrutinize insider trading by Sandgaard and Moorhead, which exploited material nonpublic information. In fact, the Audit Committee approved Zynex's May and June 2023 repurchases of 600,000 common shares directly from Sandgaard at prices that were artificially inflated by the Individual Defendants' misconduct.

56.    The Charter requires the Audit Committee to "establish and oversee procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters[.]" Despite prior lawsuits, such as a 2014 claim alleging fraudulent Medicare billing, and other red flags, the Audit Committee failed to implement effective complaint procedures, allowing the oversupplying scheme to persist undetected.

57.    The Audit Committee's breaches caused Zynex to suffer a 5% stock price drop on June 4, 2024, after the *STAT* report, and a 51.3% collapse on March 12, 2025, following the Tricare disclosure. These declines obliterated shareholder value and imposed a "liar's discount," depressing Zynex's future stock price and cost of capital, due to eroded market credibility.

58.    The financial harm includes litigation costs from the Securities Class Action, potential repayments to insurers, and tens of millions of dollars in stock repurchases at inflated prices.

59.    The reputational damage to Zynex was severe, as the *STAT* report's exposure of patient exploitation (*e.g.*, Michelle Bean's claim that Zynex "prey[ed] on people") and insurer terminations tarnished Zynex's image. The Audit Committee's negligence in addressing these

15

risks violated its duty to protect Zynex's business integrity.

60.    By participating in and allowing the publication of materially false and misleading statements, Michaels, Disbrow, and Cress harmed Zynex, exposing it to regulatory scrutiny, financial losses, and reputational ruin. Their breaches of the Audit Committee Charter's duties necessitate this derivative action to hold them accountable for the resulting damages.

61.    The Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings. The Audit Committee Defendants breached their duty of loyalty and good faith by approving the omission of material information, making improper statements detailed herein, and failing to properly oversee Zynex's public statements and internal control functions.

## SUBSTANTIVE ALLEGATIONS

62.    Zynex started in 1996 as a medical device company, touting consistent revenue growth and operational success in the United States.

63.    Prior to the Relevant Period, Zynex's activities included strategic initiatives to expand its pain management product line and enhance its sales force. The Company secured FDA clearance for new devices and introduced therapy products like the Zynex Pro Thoracic Lumbar Sacral Orthosis. These efforts were framed as evidence of Zynex's innovation and market strength, reinforcing investor confidence in its ability to sustain growth.

64.    In 2022, the Company reported a 21% year-over-year revenue increase to $158.2 million, a 48% increase in orders, and seven consecutive years of profitability. These results, announced in a March 13, 2023 press release, set the stage for optimistic projections about Zynex's growth trajectory.

65.    During the Relevant Period, the Individual Defendants orchestrated and allowed a

scheme to inflate Zynex's stock price by issuing false and misleading statements about the Company's financial performance, operational practices, and compliance with insurance reimbursement policies. These statements concealed, among other things, a systemic "oversupplying scheme" whereby Zynex shipped excessive quantities of supplies, such as electrode pads and batteries, to patients, billing insurers for thousands of dollars more than necessary.

66.     On April 27, 2023, Zynex issued a press release announcing first-quarter 2023 results, claiming a 36% revenue increase to $42.2 million and a 61% increase in orders, marking the "highest number of orders in Company history for the 4th consecutive quarter." The Company stated, "For the first quarter, the Company reported net revenue of $42.2 million, a 36% increase over [the] first quarter of 2022." These statements omitted that revenue growth was driven by improper conduct, including fraudulent billing practices.

67.     On July 27, 2023, Zynex reported second-quarter 2023 results, touting a 22% revenue increase to $45.0 million and a 51% order increase. Sandgaard declared, "The growth in net revenue is primarily related to a 51% growth in device orders, which resulted from an increased customer base." This misrepresented the true driver of revenue: improper conduct, including excessive supply shipments that inflated claims to insurers.

68.     The Company's third-quarter 2023 press release on October 26, 2023, continued the deception, announcing a 20% revenue increase to $49.9 million and a 39% order increase. Sandgaard boasted, "[t]he third quarter was highlighted by increasing revenue and cash flow momentum driven by our sixth straight quarter of record-high order numbers." These claims concealed Zynex's reliance on improper conduct, including unethical billing practices, which were drawing scrutiny from insurers.

69.    On February 29, 2024, Zynex's full-year 2023 press release reported a 17% revenue increase to $184.3 million and a 43% order increase, with Sandgaard asserting, "2023 was a year of continued execution for Zynex, underscored by record revenues and order numbers, and exciting new products and technological innovation."

70.    Throughout the Relevant Period, the Individual Defendants misrepresented Zynex's compliance with third-party payer reimbursement policies. The 2023 Form 10-K stated: "[w]e maintain an allowance for provider discounts and amounts intended to cover legitimate requests for repayment." This suggested robust controls, while concealing that Zynex's oversupplying scheme led to invalid claims and insurer denials. The Individual Defendants also failed to disclose that Zynex's practices drew scrutiny from insurers, including Tricare, which represented 20–25% of annual revenue.

71.    The truth began to emerge on June 4, 2024, when *STAT* published an investigative report titled "How a device maker inundated pain patients with unwanted batteries and surprise bills." The report revealed Zynex's oversupplying scheme, stating:

> Zynex Medical, with headquarters in Englewood, Colo., has manufactured small machines that deliver different series of electrical pulses to the injured areas via wires and electrode pads.

*    *    *

> . . . he regular shipments also allow Zynex to bill insurers for thousands of dollars more than it otherwise could.

*    *    *

> The problem is that insurers are growing wise to the program and kicking the company out of network.

72.    The *STAT* report detailed patient complaints, such as Michelle Bean, who received unneeded supplies and faced $1,000 in bills after Zynex falsely assured coverage by Tufts Health

18

Plan. Former employees confirmed the scheme's systemic nature, costing Zynex business as insurers terminated network agreements.

73.     On June 4, 2024, Zynex's stock price fell $0.50 per share, or 5%, closing at $9.35 on unusually heavy trading volume, reflecting investor alarm over the exposed misconduct. This decline eroded shareholder value and signaled market distrust in Zynex's reported financials.

74.     Despite this disclosure, the Individual Defendants continued to make misleading statements. On July 25, 2024, Zynex's second-quarter 2024 press release claimed an 11% revenue increase to $49.9 million and a 20% order increase, with Sandgaard asserting, "[t]he second quarter of 2024 was highlighted by a strong cadence of order growth and revenue[.]" The release attributed lower-than-expected revenue to sales force reductions, omitting insurer scrutiny as a factor.

75.     On October 24, 2024, Zynex reported third-quarter 2024 results, stating revenue was "$50.0 million" with a 13% order increase. Sandgaard claimed, "[i]n the third quarter of 2024 we continued our steady growth in orders as we positioned the company for long-term profitable growth[.]" These statements concealed ongoing insurer investigations, including Tricare's review of Zynex's claims.

76.     The full extent of Zynex's misconduct was revealed on March 11, 2025, when the Company issued a press release after market close, announcing fourth-quarter and full-year 2024 results. The release disclosed a significant revenue "shortfall" due to "slower than normal payments from certain payers" and revealed, "Tricare has temporarily suspended payments as they review prior claims."

77.     The March 11, 2025, press release admitted Tricare, representing 20–25% of Zynex's annual revenue, was scrutinizing prior claims, threatening the Company's financial stability. Sandgaard stated, "[o]ur fourth quarter revenue was less than expected. . . . We were

recently notified that Tricare has temporarily suspended payments as they review prior claims." This disclosure confirmed the falsity of prior claims about revenue sustainability.

78.    On March 12, 2025, Zynex's stock price plummeted $3.59 per share, or 51.3%, closing at $3.41 on heavy trading volume. This catastrophic decline wiped out significant shareholder value, reflecting the market's reaction to Zynex's exposure to regulatory and financial risks concealed by the Individual Defendants.

***False and Misleading Statements Issued During the Relevant Period***

79.    Between at least March 13, 2023 and March 11, 2025, the Individual Defendants engaged in and allowed a concerted scheme to mislead investors about Zynex's financial performance, operational practices, and regulatory compliance. By issuing false and misleading statements, the Individual Defendants artificially inflated Zynex's stock price, concealing a systemic "oversupplying scheme" that involved shipping excessive medical supplies to patients and billing insurers for unwarranted amounts.

80.    The Individual Defendants' false statements began on March 13, 2023, when Zynex issued a press release announcing its fourth-quarter and full-year 2022 financial results. The release touted robust growth, stating: "Revenue increased 21% year over year to $48.8 million" for the fourth quarter and "Revenue increased 21% year over year to $158.2 million" for the full year, with "Orders increased 48%" and "7th straight year of profitability."

81.    This press release misrepresented the sustainability of Zynex's revenue growth. The Individual Defendants failed to disclose that a material portion of the reported revenue stemmed from an unethical practice of oversupplying patients with electrode pads and batteries, inflating claims to insurers like Tricare, which represented 20–25% of Zynex's annual revenue. By omitting this material fact, the Defendants created a false impression of organic growth driven

by legitimate demand.

82.     On March 14, 2023, Zynex filed its annual report for the fiscal year ended December 31, 2022 on Form 10-K with the SEC ("2022 Form 10-K"), reaffirming the financial results announced the previous day. The 10-K was signed by each of the Individual Defendants and included purported warnings about reimbursement risks, stating:

> We are dependent on reimbursement from third-party payers      If the third-party payers do not remit payment on a timely basis or if they change their policies to exclude or reduce coverage for our products, we would experience a decline in our revenue as well as cash flow. . . . Failure to adequately identify and provide for amounts for resolution of repayment demands in our allowance for provider discounts could have a material adverse effect on our results of operations and cash flows.

83.     This statement was misleading because it suggested Zynex maintained adequate controls to address reimbursement disputes, while concealing that the Company's revenue was inflated by fraudulent billing practices. The Individual Defendants knew or recklessly disregarded that Zynex's oversupplying scheme was generating invalid claims, drawing scrutiny from insurers, and increasing the risk of network terminations and penalties.

84.     The 2022 Form 10-K also included a purported warning about governmental audits, stating:

> We face periodic reviews and billing audits from governmental and private payers . . . If billing errors are identified in the sample of reviewed claims, the billing error can be extrapolated to all claims filed which could result in a larger overpayment than originally identified . . . [A]n adverse review or audit could result in: required refunding or retroactive adjustment of amounts we have been paid . . . state or Federal agencies imposing fines, penalties and other sanctions on us; loss of our right to participate in . . . one or more private payer networks.

85.     This disclosure was materially misleading because it framed audits as hypothetical risks, while the Individual Defendants were aware or should have been aware that Zynex's billing practices were already under scrutiny. By downplaying the likelihood of adverse consequences,

the Individual Defendants misled investors about the Company's exposure to regulatory and financial risks.

86.    On April 27, 2023, Zynex issued a press release announcing first-quarter 2023 financial results, claiming a 36% revenue increase to $42.2 million and a 61% increase in orders year-over-year. The press release also indicated that Zynex had received the highest number of orders in Company history for the 4th consecutive quarter.

87.    These statements were false and misleading because the reported revenue and order growth were driven in material part by the oversupplying scheme, not legitimate customer demand. The Individual Defendants omitted that Zynex was shipping excessive supplies to patients, inflating claims to insurers, and risking reimbursement denials. This misrepresentation painted a deceptively positive picture of Zynex's financial health, misleading investors about the Company's operational integrity.

88.    On July 27, 2023, Zynex released its second-quarter 2023 financial results, announcing a 22% revenue increase to $45.0 million and a 51% increase in orders. The press release stated:

> Net revenue was $45.0 million for the three months ended June 30, 2023, an increase of 22% from $36.8 million in the prior year quarter. The growth in net revenue is primarily related to a 51% growth in device orders, which resulted from an increased customer base.

89.    The press release further commented, "[o]rders increased 51% year-over-year; highest number of orders in Company history for the 5th consecutive quarter." These claims were misleading because the revenue and order increases were artificially inflated by Zynex's practice of sending unneeded supplies, which generated fraudulent claims. The Individual Defendants concealed that insurers were beginning to scrutinize these practices, increasing the likelihood of network terminations.

90.     The July 27, 2023, press release also highlighted strategic achievements, such as FDA clearance for the CM-1600 blood and fluid volume monitoring device and a $10 million share repurchase program. These statements implied operational strength and financial stability, further obscuring the risks posed by the oversupplying scheme. By failing to disclose this driver of revenue, the Individual Defendants misled investors about Zynex's long-term prospects.

91.     On October 26, 2023, Zynex issued a press release for third-quarter 2023 results, reporting a 20% revenue increase to $49.9 million and a 39% increase in orders. Sandgaard stated:

> The third quarter was highlighted by increasing revenue and cash flow momentum driven by our sixth straight quarter of record-high order numbers . . . Our continued profitability and record positive cash flow allowed us to announce an additional $10 million share repurchase plan.

92.     This statement was false because the revenue growth was not driven by sustainable demand but by the fraudulent oversupplying scheme. The Individual Defendants' claim of "increasing revenue and cash flow momentum" omitted the material fact that Zynex's billing practices were under insurer scrutiny, risking significant revenue disruptions. The reference to a share repurchase plan further misled investors by suggesting financial confidence, despite looming regulatory risks.

93.     The October 26, 2023, press release also announced new therapy products, including the Zynex Pro Thoracic Lumbar Sacral Orthosis, claiming, "we continue to develop the next generation of patient monitoring equipment." This statement implied innovation-driven growth, while concealing that Zynex's core revenue stream relied in material part on unethical billing practices, exposing the Company to insurer backlash and potential penalties.

94.     On February 29, 2024, Zynex issued a press release announcing fourth-quarter and full-year 2023 financial results, reporting a 17% full-year revenue increase to $184.3 million and a 43% order increase. Sandgaard stated:

> 2023 was a year of continued execution for Zynex, underscored by record revenues and order numbers, and exciting new products and technological innovation . . . A strong cadence of increasing sales and profitable growth for our pain management division delivered a 43% improvement in orders year-over-year.

95.     This press release was misleading because it attributed revenue growth to "increasing sales and profitable growth," while omitting that the oversupplying scheme materially inflated revenue by billing insurers for unneeded supplies.

96.     The February 29, 2024, press release projected 2024 net revenue growth of approximately 22%, Sandgaard stated, "[w]e expect 2024 net revenue to increase approximately 22% compared to 2023. Part of our revenue growth will come from more aggressively promoting our bracing line of products[.]" This was misleading because it failed to account for the risks posed by insurer scrutiny and potential network terminations, which threatened Zynex's revenue stream.

97.     On March 12, 2024, Zynex filed its 2023 Form 10-K (which was signed by each of the Individual Defendants), reaffirming the 2023 financial results and repeating the misleading reimbursement risk disclosure from the 2022 Form 10-K:

> We are dependent on reimbursement from third-party payers. . . . Failure to adequately identify and provide for amounts for resolution of repayment demands in our allowance for provider discounts could have a material adverse effect on our results of operations and cash flows.

98.     This statement was false because it implied Zynex had adequate controls, while the Individual Defendants knew or recklessly disregarded that the Company's billing practices were generating invalid claims, drawing scrutiny from insurers like Tricare. The omission of this material fact misled investors about Zynex's financial stability and compliance.

99.     The 2023 Form 10-K also repeated the audit risk disclosure, stating:

> We face periodic reviews and billing audits from governmental and private payers . . . [a]n adverse review or audit could result in: required refunding or retroactive adjustment of amounts we have been paid . . . loss of our right to participate in . . . one or more private payer networks.

100.     This disclosure was misleading because it presented audits as routine risks, while concealing that Zynex's oversupplying scheme had already attracted insurer attention, increasing the likelihood of adverse outcomes. The Individual Defendants' failure to disclose this scrutiny misrepresented Zynex's regulatory compliance.

101.     On April 30, 2024, Zynex issued a press release for first-quarter 2024 results, reporting a 10% revenue increase to $46.5 million and a 23% order increase. Sandgaard stated:

> During the first quarter of 2024, we continued our focus on order growth, FDA approvals of next-generation devices, and new therapy products . . . We expect to recognize that revenue over the remainder of the year and reaffirm 2024 guidance of at least $227 million.

102.     This reaffirmation of 2024 guidance misled investors by suggesting revenue stability, despite growing risks from insurer investigations.

103.     The truth about the Individual Defendants' improper practices began to emerge on June 4, 2024, when the medical journal *STAT* published an investigative report titled "How a device maker inundated pain patients with unwanted batteries and surprise bills." This report detailed Zynex's unethical billing practices, stating:

> Zynex Medical, with headquarters in Englewood, Colo., has manufactured small machines that deliver different series of electrical pulses to the injured areas via wires and electrode pads.
>
> *        *        *
>
> . . . the regular shipments also allow Zynex to bill insurers for thousands of dollars more than it otherwise could.
>
> *        *        *
>
> The problem is that insurers are growing wise to the program and kicking the company out of network.

104.     The *STAT* report revealed that Zynex's oversupplying scheme involved sending

unneeded electrode pads and batteries to patients, generating fraudulent claims that cost insurers thousands. It cited patient Michelle Bean, who received monthly shipments despite minimal device use and faced $1,000 in bills after Zynex falsely assured coverage by Tufts Health Plan. Bean remarked, "I just feel like the whole thing was a way to make money and prey on people."

105.    The report further disclosed that insurers were terminating Zynex from their networks due to these practices, leaving patients liable for unsolicited supplies. It noted, "STAT interviewed five other patients in the same predicament as Bean, and reviewed dozens of similar complaints in online forums." Former employees confirmed the scheme's systemic nature, stating it "frequently cost the company business" as insurers rejected claims.

106.    Despite these disclosures, the Individual Defendants continued to mislead investors. On July 25, 2024, Zynex issued a press release for second-quarter 2024 results, reporting an 11% revenue increase to $49.9 million and a 20% order increase. Sandgaard stated:

> The second quarter of 2024 was highlighted by a strong cadence of order growth and revenue as we work toward FDA approvals of next-generation devices and launch of new pain management products . . . Revenue during the quarter was impacted by a continued change in product mix . . . and a reduction in sales representatives.

107.    This statement was misleading because it attributed revenue shortfalls to product mix and sales force reductions, omitting that insurer scrutiny, including from Tricare, was delaying payments due to the oversupplying scheme. The Individual Defendants' failure to disclose this scrutiny perpetuated the false narrative of operational strength, delaying the full revelation of Zynex's risks.

108.    The July 25, 2024, press release also claimed, "In the second quarter, increasing sales and profitable growth for our pain management division delivered a 20% improvement in orders  year-over-year."  This  misrepresented  the  sustainability  of  order  growth,  as  the

oversupplying scheme artificially inflated orders, exposing Zynex to insurer backlash and potential

revenue losses.

109.     On October 24, 2024, Zynex issued a press release for third-quarter 2024 results,

reporting revenue of $50.0 million and a 13% order increase. Sandgaard stated:

> In the third quarter of 2024 we continued our steady growth in orders as we
> positioned the company for long-term profitable growth . . . Our Pain Management
> division delivered a 13% improvement in orders year-over-year . . . Revenue per
> sales rep increased 25% year-over-year to approximately $530,000 in the third
> quarter of 2024.

110.     This statement was misleading because it concealed ongoing insurer investigations,

including Tricare's review of Zynex's claims, which threatened 20–25% of the Company's

revenue. The claim of "steady growth" misled investors by omitting the material risk of payment

suspensions, perpetuating the artificial inflation of Zynex's stock price.

111.     The October 24, 2024, press release also highlighted FDA clearance for the

TensWave device, suggesting innovation-driven growth. This misrepresented Zynex's prospects,

as the Company's core revenue relied on improper billing practices, undermining its financial

stability. The Individual Defendants' failure to disclose these risks further delayed investor

awareness of Zynex's true condition.

112.     The Individual Defendants' misconduct was more fully revealed on March 11,

2025, after market close, when the Company issued a press release announcing fourth-quarter and

full-year 2024 financial results. The release disclosed a significant revenue "shortfall" due to

"slower than normal payments from certain payers" and revealed:

Our fourth quarter revenue was less than expected. The shortfall was due to slower than

normal payments from certain payers and we were recently notified that Tricare has temporarily

suspended payments as they review prior claims. . . . TriCare currently represents approximately

20-25% of our annual revenue.

113.    This disclosure confirmed the misleading nature of Defendants' prior statements, such as Sandgaard's October 26, 2023, claim of "increasing revenue and cash flow momentum" and the February 29, 2024, projection of 22% revenue growth for 2024. The Tricare payment suspension exposed Zynex's reliance on fraudulent claims, threatening a significant portion of its revenue stream.

114.    The March 11, 2025, press release also announced a 15% staff reduction, primarily in corporate departments, to align with reduced revenue, stating, "[t]his staff reduction along with other expense reductions . . . will result in savings of approximately $35 million annually." This restructuring underscored the severity of Zynex's financial distress, contradicting prior claims of "long-term profitable growth."

115.    On March 12, 2025, Zynex's stock price plummeted $3.59 per share, or 51.3%, closing at $3.41 on unusually heavy trading volume. This catastrophic decline obliterated shareholder value, reducing Zynex's market capitalization by over half in a single day. The drop reflected the market's realization that Zynex's revenue was unsustainable due to its fraudulent practices and regulatory scrutiny.

116.    The March 12, 2025, stock price collapse caused immediate financial harm to Zynex, as shareholders who relied on the Defendants' false statements suffered massive losses. The Company's market credibility was shattered, imposing a "liar's discount" that will depress its stock price for years, as investors distrust future financial reports.

**False and Misleading Statements in the 2023 and 2024 Proxy Statements**

117.    Defendants Sandgaard, Disbrow, Cress, and Michaels (the "Director Defendants") negligently misrepresented and failed to disclose material information in Zynex's proxy statements

filed on March 30, 2023 ("2023 Proxy Statement") and April 1, 2024 ("2024 Proxy Statement"), thereby misleading shareholders about the effectiveness of the Board's oversight as well as Zynex's financial performance, governance, compliance, and strategic priorities.

118.     The Director Defendants filed the Company's 2023 Proxy Statement on March 30, 2023, disclosing information in connection with Zynex's Annual Meeting on May 17, 2023.  The 2023 Proxy Statement outlined the Board's responsibility for:

> oversee[ing] management of the Company's risks and looks to its audit committee, as well as senior management, to support the Board's oversight role. The Company's Audit Committee assists with oversight of financial risks. The full Board regularly receives information through committee reports and from members of senior management on areas of material risk to the Company, including operational, financial, legal and regulatory, technical and strategic risks.

119.     The Director Defendants negligently omitted the material risks related to their failures of oversight regarding the oversupplying scheme and related misconduct, leading to shareholders voting "FOR" the reelection of the Director Defendants to the Board.  Absent such omissions, the Director Defendants would likely not have been reelected.

120.     The 2023 Proxy Statement detailed the Compensation Committee's duty to "to review and approve all corporate goals and objectives applicable to the compensation of the CEO, evaluate annually the CEO's performance in light of those goals and determine and approve the CEO's compensation level based on its evaluation."

121.     The Director Defendants negligently omitted the material risks related to their failures of oversight regarding Sandgaard's participation in the oversupplying scheme and related misconduct, and the committee's failure to align CEO compensation with legitimate performance, leading to shareholders voting "FOR" the reelection of the Director Defendants to the Board. Absent such omissions, the Director Defendants would likely not have been reelected.

122.     The 2023 Proxy Statement detailed the Nominating and Corporate Governance

Committee's responsibilities, including "to oversee the Company's corporate governance practices
and procedures."

123.    The Director Defendants negligently omitted the material risks related to their
failures of oversight regarding the oversupplying scheme and related misconduct, leading to
shareholders voting "FOR" the reelection of the Director Defendants to the Board.  Absent such
omissions, the Director Defendants would likely not have been reelected.

124.    The 2023 Proxy Statement described the Audit Committee's role in "oversight of the
integrity of the Company's accounting, auditing, and reporting practices," including:

- Overseeing the integrity of Zynex's financial reporting

- Overseeing the independence, qualifications and performance of Zynex's
  external independent registered public accounting firm and the performance
  of Zynex's internal auditors

- Reviewing with independent registered public accounting firm and outside
  legal counsel: legal matters that may have a material impact on the financial
  statements; any fraud involving management or other employees who have
  a significant role in Zynex's internal controls; compliance policies; and any
  material reports or inquiries received that raise material issues regarding
  Zynex's financial statements and accounting or compliance policies. The
  Committee oversees the Company's anonymous complaint policy contained
  within the Company's [Code] regarding the confidential, anonymous
  submission by employees of reports regarding questionable accounting
  practices, internal accounting controls or auditing matters and the
  investigation, disposition and retention of such reports

- Reviewing annual audited financial statements with management and the
  Zynex's independent registered public accounting firm and recommending
  to the Board whether the financial statements should be included in the
  Company's Annual Report on Form 10-K.

- Reviewing and discussing with management and Zynex's independent
  registered public accounting firm quarterly financial statements and
  earnings releases

*        *        *

- Discussing policies with respect to risk assessment and risk management,

including risks affecting Zynex's financial statements, operations, business
continuity, and reputation and the reliability and security of the Company's
information technology and security systems, and the steps management has
undertaken to monitor and control such exposures

\*       \*       \*

- Advising the Board with regard to Zynex's policies and procedures
regarding compliance with laws and regulations

\*       \*       \*

- Reviewing the adequacy and effectiveness of Zynex's internal control over
financial reporting, including information technology and security systems
related to internal controls, and disclosure controls and procedures

125.    The Director Defendants negligently omitted the material risks related to the Audit

Committee's failures of oversight regarding the oversupplying scheme and related misconduct

(including the misleading financials, disclosures, and compliance failures), leading to shareholders

voting "FOR" the reelection of the Director Defendants to the Board.  Absent such omissions, the

Director Defendants would likely not have been reelected.

126.    Zynex's 2024 Proxy Statement was similarly misleading.  The Director Defendants

filed the Company's 2024 Proxy Statement on April 1, 2024, disclosing information in connection

with Zynex's Annual Meeting on May 16, 2024.  The 2024 Proxy Statement outlined the Board's

responsibility for:

oversee[ing] management of the Company's risks and looks to its audit committee,
as well as senior management, to support the Board's oversight role. The
Company's Audit Committee assists with oversight of financial risks. The full
Board regularly receives information through committee reports and from members
of senior management on areas of material risk to the Company, including
operational, financial, legal and regulatory, technical and strategic risks.

127.    The Director Defendants negligently omitted the material risks related to their

failures of oversight regarding the oversupplying scheme and related misconduct, leading to

shareholders voting "FOR" the reelection of the Director Defendants to the Board.  Absent such

omissions, the Director Defendants would likely not have been reelected.

128.    The 2024 Proxy Statement detailed the Compensation Committee's duty to "to review and approve all corporate goals and objectives applicable to the compensation of the CEO, evaluate annually the CEO's performance in light of those goals and determine and approve the CEO's compensation level based on its evaluation."

129.    The Director Defendants negligently omitted the material risks related to their failures of oversight regarding Sandgaard's participation in the oversupplying scheme and related misconduct, and the committee's failure to align CEO compensation with legitimate performance, leading to shareholders voting "FOR" the reelection of the Director Defendants to the Board. Absent such omissions, the Director Defendants would likely not have been reelected.

130.    The 2024 Proxy Statement detailed the Nominating and Corporate Governance Committee's responsibilities, including "to oversee the Company's corporate governance practices and procedures."

131.    The Director Defendants negligently omitted the material risks related to their failures of oversight regarding the oversupplying scheme and related misconduct (including the insider selling), leading to shareholders voting "FOR" the reelection of the Director Defendants to the Board. Absent such omissions, the Director Defendants would likely not have been reelected.

132.    The 2024 Proxy Statement described the Audit Committee's role in "oversight of the integrity of the Company's accounting, auditing, and reporting practices," including:

- Overseeing the integrity of Zynex's financial reporting

- Overseeing the independence, qualifications and performance of Zynex's external independent registered public accounting firm and the performance of Zynex's internal auditors

- Reviewing with independent registered public accounting firm and outside legal counsel: legal matters that may have a material impact on the financial

statements; any fraud involving management or other employees who have a significant role in Zynex's internal controls; compliance policies; and any material reports or inquiries received that raise material issues regarding Zynex's financial statements and accounting or compliance policies. The Committee oversees the Company's anonymous complaint policy contained within the Company's [Code] regarding the confidential, anonymous submission by employees of reports regarding questionable accounting practices, internal accounting controls or auditing matters and the investigation, disposition and retention of such reports

- Reviewing annual audited financial statements with management and the Zynex's independent registered public accounting firm and recommending to the Board whether the financial statements should be included in the Company's Annual Report on Form 10-K

- Reviewing and discussing with management and Zynex's independent registered public accounting firm quarterly financial statements and earnings releases

*       *       *

- Discussing policies with respect to risk assessment and risk management, including risks affecting Zynex's financial statements, operations, business continuity, and reputation and the reliability and security of the Company's information technology and security systems, and the steps management has undertaken to monitor and  control such exposures

*       *       *

- Advising the Board with regard to Zynex's policies and procedures regarding compliance with laws and regulations

*       *       *

- Reviewing the adequacy and effectiveness of Zynex's internal control over financial reporting, including information technology and security systems related to internal controls, and disclosure controls and procedures

133.    The Director Defendants negligently omitted the material risks related to the Audit Committee's failures of oversight regarding the oversupplying scheme and related misconduct (including the misleading financials, disclosures, and compliance failures), leading to shareholders voting "FOR" the reelection of the Director Defendants to the Board.  Absent such omissions, the

33

Director Defendants would likely not have been reelected.

## THE INDIVIDUAL DEFENDANTS SOLD COMPANY STOCK AT ARTIFICIALLY INFLATED PRICES

134.    Defendants Sandgaard and Moorhead breached their fiduciary duties to Zynex by engaging in insider trading, selling substantial quantities of Zynex common stock at artificially inflated prices, on the basis of material nonpublic information about Defendants' misconduct.

135.    On May 10, 2023, Sandgaard sold 300,000 shares of his own Zynex common stock back to the Company at the artificially inflated price of $9.61 per share, realizing proceeds of more than $2.88 million. On June 13, 2023, Sandgaard sold another 300,000 shares of his Zynex common stock back to the Company at the artificially inflated price of $8.62 per share, realizing proceeds of more than $2.58 million. In each instance, the transaction was approved by the Board's Audit Committee and the purportedly disinterested members of the Board, in violation of each of the Individual Defendants' fiduciary duties.

136.    Additionally, during October and November 2024, Sandgaard sold 24,000 shares of Zynex common stock at artificially inflated prices, reaping more than $200,000 in proceeds.

137.    Between August 2023 and March 2025, Moorhead sold 85,000 shares of his own Zynex common stock at artificially inflated prices, generating more than $680,000 in proceeds.

138.    Defendants' insider trading exploited material nonpublic information, breaching their duties of loyalty and good faith, and unjustly enriching them at Zynex's expense. Disgorgement of their profits is necessary to remedy the harm inflicted on the Company and its shareholders.

## DAMAGES TO ZYNEX

139.    As a direct and proximate result of the Individual Defendants' misconduct, Zynex has expended and will continue to expend significant sums of money.

140.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

141.    Such expenditures will also include costs incurred in any internal investigation pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

142.    Zynex has also suffered, and will continue to suffer, a loss of reputation and goodwill as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward due to their misrepresentations.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

143.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as though fully set forth herein.

144.    Plaintiff brings this action derivatively in the right and for the benefit of Zynex to redress injuries suffered, and to be suffered, as a direct and proximate result of the wrongdoing and breaches of fiduciary duty alleged herein.

145.    Plaintiff owns Zynex common stock and has been a continuous shareholder at all relevant times. Plaintiff will adequately and fairly represent the interests of Zynex in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

146.    Zynex is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

147.    At the time this action was filed, Zynex's Board consisted of Defendants Sandgaard, Cress, Michaels, and Disbrow (the "Director Defendants"). Plaintiff needs only to

allege that demand is futile as to a majority of the Director Defendants that were on the Board at the time of filing this complaint.

148.    A pre-suit demand on the Board to institute this action is futile because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action. The Director Defendants will not bring a suit on behalf of Zynex to recover damages sustained because of this misconduct because they would expose themselves to significant liability. As such, demand is futile as to the Director Defendants.

149.    The Director Defendants all face a substantial likelihood of liability for their individual misconduct, as they were directors during the time of the false and misleading statements and as such had a fiduciary duty to ensure that Zynex's SEC filings, press releases, and other public statements and presentations on behalf of Zynex concerning its business, operations, prospects, internal controls, and financial statements were accurate.

150.    The Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that Zynex was acting legally and its internal controls were sufficiently robust and effective, and to ensure that the Board's duties were being discharged in good faith and with the required diligence. Instead, they reviewed, authorized and/or caused the publication of the materially false and misleading statements discussed above that caused Zynex's stock to trade at artificially inflated prices.

151.    The Director Defendants knowingly and consciously allowed the authorization of false and misleading statements, failed to timely correct such statements, failed to take necessary and appropriate steps to ensure that Zynex's internal controls were sufficiently robust and effective, and failed to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence. These knowing and conscious failures

breached the fiduciary duties of loyalty and good faith, for which the Director Defendants face a substantial likelihood of liability.

152.    Demand on Defendant Sandgaard is futile for the additional reasons that follow. Defendant Sandgaard receives substantial compensation from the Company. As the Company admits in its 2025 Proxy Statement, Defendant Sandgaard is a non-independent director. Thus, Defendant Sandgaard is not independent from the members of the Compensation Committee who are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including himself. Further, despite being the Company's highest officer and a trusted Company director, Defendant Sandgaard failed to adequately oversee the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor controls over reporting and engagement in the scheme, and willfully ignored his duty to protect corporate assets. Additionally, Defendant Sandgaard both solicited the false and misleading 2023 and 2024 Proxy Statements and signed the 2022 and 2023 Form 10-Ks. For these reasons, Defendant Sandgaard breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Sandgaard is futile, and, therefore, excused.

153.    Demand on Defendant Cress is futile for the additional reasons that follow Defendant Cress has served as a Company director since 2018 and receives substantial compensation from the Company. Despite his role as a Company Director, Defendant Cress failed to adequately oversee the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor controls over reporting and engagement in the scheme, and willfully ignored his duty to protect corporate assets. Furthermore, Defendant Cress both solicited the false and misleading 2023 and 2024 Proxy Statements and signed the 2022 and 2023

Forms 10-Ks. For these reasons, Defendant Cress breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Cress is futile, and, therefore, excused.

154.    Demand on Defendant Michaels is futile for the additional reasons that follow Defendant Michaels has served as a Company director since 2018 and receives substantial compensation from the Company. Despite his role as a Company Director, Defendant Michaels failed to adequately oversee the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor controls over reporting and engagement in the scheme, and willfully ignored his duty to protect corporate assets. Furthermore, Defendant Michaels both solicited the false and misleading 2023 and 2024 Proxy Statements and signed the 2022 and 2023 Forms 10-Ks. For these reasons, Defendant Michaels breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Michaels is futile, and, therefore, excused.

155.    Demand on Defendant Disbrow is futile for the additional reasons that follow Defendant Disbrow has served as a Company director since 2018 and receives substantial compensation from the Company. Despite his role as a Company Director, Defendant Disbrow failed to adequately oversee the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor controls over reporting and engagement in the scheme, and willfully ignored his duty to protect corporate assets. Furthermore, Defendant Disbrow both solicited the false and misleading 2023 and 2024 Proxy Statements and signed the 2022 and 2023 Forms 10-Ks. For these reasons, Defendant Disbrow breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Disbrow is futile, and, therefore, excused.

156.    Demand on Defendants Cress, Michaels, and Disbrow is further futile for the additional reasons that follow. Defendants Cress, Michaels, and Disbrow served as members of the Audit Committee (the "Audit Committee Defendants") during the Relevant Period. The Audit Committee is responsible for assisting the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting, the underlying internal controls and procedures over financial reporting, and the effectiveness of the Company's policies and procedures. These responsibilities include oversight of (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the external auditors' qualifications and independence; and (iv) the performance of the Company's internal and external audit functions. The Committee is also responsible for understanding the Company's internal control structure and areas that represent high risk for material misstatement of the financial statements. In violation of their duties, the Audit Committee Defendants failed to adequately review and discuss the Company's Form 10-Ks; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Company Codes, resulting in materially false and misleading statements regarding the Company's business. The Audit Committee Defendants failed to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations, as alleged herein. For these reasons, the Audit Committee Defendants breached their fiduciary duties, face a substantial likelihood of liability, and are not independent or disinterested. Thus, demand upon the Audit Committee Defendants is futile, and, therefore, excused.

157.    Zynex has and will continue to be exposed to substantial losses due to the wrongdoing complained of herein, yet the Director Defendants have not caused Zynex to take

action, including filing lawsuits against the Individual Defendants or those responsible for the wrongful conduct, to recover the damages Zynex has suffered and will continue to suffer. Thus, demand on the Director Defendants is futile and, therefore, excused.

158.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause Zynex to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

159.    The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

160.    The Individual Defendants' conduct described herein is not the result of legitimate business judgment. Rather, their conduct was the product of bad faith and intentional, reckless, or disloyal misconduct. As such, none of the Director Defendants can claim exculpation from their violations of duty. A majority of the Director Defendants face a substantial likelihood of liability, are self-interested in the transactions challenged herein, and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of Zynex. Thus, demand is futile and, therefore, excused.

161.    The Director Defendants may also be protected against personal liability for the misconduct and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Zynex. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as the "insured-versus-insured exclusion." If the Director Defendants were to sue themselves or certain of the officers of Zynex, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

162.    If there is no directors' and officers' liability, then the Director Defendants will not cause Zynex to sue the Individual Defendants since they would face a large uninsured individual liability. Thus, demand is futile in that event as well.

163.    For the reasons set forth above, all of the Director Defendants, and if not all of them, a majority, cannot consider a demand with the requisite disinterestedness and independence. Consequently, a demand on the Board is excused as futile.

## COUNT I

### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

164.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

165.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

166.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

167.    In the exercise of reasonable care, the Individual Defendants should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 and 2024 Proxy Statements were materially false and misleading. These misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the proxy statements.

168.    The false and misleading elements of the 2023 and the 2024 Proxy Statements led to the re-election of the Individual Defendants to the Board, allowing them to continue breaching their fiduciary duties to Zynex.

169.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

170.    Plaintiff, on behalf of Zynex, has no adequate remedy at law.

## COUNT II

### *Against the Individual Defendants for Breach of Fiduciary Duty*

171.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

172.    By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

173.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision.

174.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

175.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

176.    Additionally, Sandgaard's and Moorhead's insider sales of stock while in possession and control and on the basis of material, adverse, nonpublic information was a breach of their fiduciary duties of loyalty and good faith.

177.    By encouraging and accomplishing the illegal and improper actions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

178.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Zynex has sustained and continues to sustain significant damages. The Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending the Securities Class Action, overpayment for stock repurchases, severe damage to the share price of the Company's stock, and an increased cost of capital. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

179.    Plaintiff, on behalf of Zynex, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Gross Mismanagement

180.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

181.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

182. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Zynex has sustained significant damages in excess of hundreds of millions of dollars and will continue to sustain significant damages.

183. Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

184. Plaintiff, on behalf of Zynex, has no remedy at law.

## COUNT IV

### *Against the Individual Defendants for Waste of Corporate Assets*

185. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

186. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

187. As a result of the misconduct described above, and by failing to properly consider the interests of Zynex and its public shareholders, the Individual Defendants wasted corporate assets by, inter alia: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; (iii) incurring potentially millions of dollars of legal liability and/or legal costs to investigate and defend Defendants' unlawful actions; and (iv) causing the loss of financing from investors and business from future customers who no longer trust Zynex and its products.

188. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

189. Plaintiff, on behalf of Zynex, has no adequate remedy at law.

## COUNT V

### *Against the Individual Defendants for Unjust Enrichment*

190.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

191.    By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Zynex.

192.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

193.    Plaintiff, as a shareholder and representative of the Company seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

194.    Plaintiff, on behalf of Zynex, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of Zynex and that Plaintiff is a proper and adequate representative of the Company;

B.    Against all Individual Defendants and in favor of Zynex for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of

fiduciary duties and other acts and transactions complained of herein;

   C.  Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Zynex;

   D.  Grant appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties, including, but not limited to, directing Zynex to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Zynex and its stockholders from a repeat of the damaging events described herein;

   E.  Awarding to Zynex restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

   F.  Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees, costs, and expenses; and

   G.  Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

   Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.

Dated: August 12, 2025     **THE ROSEN LAW FIRM, P.A.**

           By: /s/ Phillip Kim
           Phillip Kim
           275 Madison Avenue, 40th Floor
           New York, NY 10016
           Telephone: (212) 686-1060
           Facsimile: (212) 202-3827
           Email: philkim@rosenlegal.com

           *Counsel for Plaintiff*

Docusign Envelope ID: 656C0F0E-9A89-4342-89BE-4394AFF6D969

## VERIFICATION

      I, Daniel Graziano am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

DocuSigned by:

*Daniel Graziano*

5AE80DDFCF624C8          7/23/2025

Daniel Graziano